Filed 8/27/13  P. v. Pinho CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C070054 |
| v. | (Super. Ct. No. 11F3431) |
| ALBERT WILLIAM PINHO III, | |
| Defendant and Appellant. | |

Defendant Albert William Pinho III entered Mary Johnson's mobile home late at night with the intent to steal $20,000 he believed her son had given her for safe keeping. When Johnson awoke and confronted the intruder, defendant assaulted her, tied her up, and threatened her life.  He then ran into the kitchen, emptied the garbage can onto the floor, returned to the bedroom with the empty can, and said:  "I'm the Mexican Mafia and your son owes us twenty thousand dollars and I want it."  Johnson denied having the money.  Defendant filled the garbage can with a number of items that could potentially contain money, loaded the garbage can into Johnson's car, and left in the vehicle.

Defendant was convicted by jury of first degree residential robbery (Count 1), first degree residential burglary (Count 2), assault with a deadly weapon (Count 3), assault with force likely to cause great bodily injury (Count 4), making a criminal threat (Count

1

5), false imprisonment (Count 6), and the unlawful taking or driving of a vehicle (Count 7). The trial court sentenced defendant to serve an aggregate term of 10 years in state prison (six years (upper term) for Count 2, plus one year (one-third the middle term) each for Counts 3 and 4, plus eight months (one-third the middle term) each for Counts 5 through 7; six years (upper term) was imposed for Count 1, but stayed pursuant to Penal Code[1] section 654).

On appeal, defendant contends the trial court was required to impose and execute sentence on Count 1 as the principal offense and stay execution of the sentences imposed on Counts 2 through 7 pursuant to section 654. We conclude each of the crimes committed by defendant in this case was incident to a single criminal objective, stealing from the victim. Accordingly, we need not decide whether the trial court erred in using Count 2 as the principal term rather than Count 1. Either way, the result is the same. Execution of the sentences imposed on the remaining counts must be stayed. Because the trial court has already stayed execution of sentence on Count 1, we modify the judgment to do the same with respect to Counts 3 through 7. As modified, we affirm the judgment.

FACTS

In June 2011, Johnson lived in a mobile home in Redding, California. Defendant lived in the same mobile home park and became friends with her son, J.R., who lived with Johnson periodically. Due to Johnson's chronic obstructive pulmonary disease, defendant's roommate, Brandi Cudney, helped her with cleaning and grocery shopping. Defendant also did occasional "odd jobs" for Johnson, such as fixing her washing machine and painting the roof of her mobile home. Defendant was paid a small sum for his labor, no more than $10. Johnson retrieved the money from either her clothes or her dresser drawers.

---

[1] Undesignated statutory references are to the Penal Code.

Shortly before the events giving rise to this appeal, J.R. moved to Wisconsin. Prior to the move, he borrowed $40,000 from his brother and initially intended to give $20,000 to Johnson for safe keeping until he got settled, but ultimately decided to take the entire sum with him. After Johnson's son moved out, defendant began asking her about the money. Johnson told defendant her son took the money with him. When it became clear defendant did not believe her, she told him she put the money in a safe deposit box. Defendant still did not believe her.

On June 19, 2011, at about 6:00 p.m., Johnson was sitting on her back porch when defendant came over unannounced. Johnson gave him money to buy a pint of whiskey and sent him to the store in her car. When defendant returned, the two spent a couple of hours drinking whiskey and talking. Defendant left after they finished the bottle. Johnson was "tipsy" and decided to go inside to watch television. She went to bed a short time later. Johnson routinely took medication to help her sleep, which defendant knew, but decided not to mix that medication with the whiskey she had already consumed. Meanwhile, defendant returned to his mobile home and continued drinking with Cudney. He left at about 2:00 a.m., telling Cudney that "he was going to go get money from somebody that owed him money."

Sometime during the ensuing four hours, a naked defendant entered Johnson's mobile home with the intent to steal the $20,000 he believed was there. As defendant later explained, the reason for his nudity was to prevent someone from being able to grab onto his clothing in case his crime was discovered. Johnson awoke to the "rustling" sound of defendant searching for the money in her bedroom closet. At first, she thought it was her cat and went back to sleep. A few minutes later, the sound again woke her up. Johnson sat up in bed and asked: "[I]s there somebody in my bedroom?" At that point, she saw a dark figure coming towards her. This figure, proved beyond a reasonable doubt to be defendant, punched her in the face and head, dragged her to the other side of

3

her bed by the hair, tied an electric cord around her neck and legs, pulled the bed's mattress on top of her, and threatened several times in a whispered voice: "I'll kill you, bitch. I'll kill you. I'll rape you." Defendant then ran into the kitchen, emptied the garbage can onto the floor, and returned to the bedroom with the empty can. While he was out of the room, Johnson managed to get to her feet and yell for help. Defendant pushed her to the floor and said: "I told you to stay on the ground, bitch." He then told her: "I'm the Mexican Mafia and your son owes us twenty thousand dollars and I want it." Johnson said she did not have the money. Defendant filled the garbage can with three dresser drawers, shoes, clothes, and a jewelry box, loaded the garbage can into Johnson's car, returned to the mobile home, told Johnson not to get up for 20 minutes, and then left in the car. Johnson neither saw defendant's face nor recognized his voice. As she explained: "He was real kind of quiet, but like he was disguising his voice."

Defendant drove Johnson's car to an open field near a friend's apartment in the town of Shasta Lake. On the way, the car bottomed out at the intersection of Redwood Boulevard and White River Drive, which caused some of Johnson's belongings to spill out onto the street. A neighbor heard what she believed to be an accident and came out to investigate. Finding prescription bottles and check books in the street with Johnson's name on them, the neighbor called the police. Defendant continued on to Shasta Lake, parked in the field, and stopped at two nearby houses. The first, at around 6:00 a.m., was to Linda Nagy's house. Defendant was looking for Nagy's son, who was not home. Nagy described defendant as wearing an unbuttoned shirt and his appearance as "kind of in a disarray, just anxious." He asked for some water and said he was in a fight. Nagy directed defendant to the garden hose.

Defendant's second stop, at around 7:00 a.m., was to Kristi McGiboney's apartment, just north of the field where he parked Johnson's car. Defendant told McGiboney that "he was in a lot of trouble" and appeared to be "[s]cared, nervous." He

4

had blood on his shirt and scratches on his head and face. The blood looked as though it had been transferred onto the shirt while it was folded. Defendant told McGiboney details of the crime, but instead of admitting he entered Johnson's mobile home to steal $20,000, he claimed to have entered a man's house to retrieve property that had been stolen from his grandfather. However, defendant admitted to being discovered while in a closet; he admitted a struggle ensued and he was nude "[s]o they wouldn't have nothing [*sic*] to grab onto," although he claimed the fight was two against one; he admitted to using an electric cord and mattress to subdue the victims; he admitted to disguising his voice during the robbery; he also admitted that property taken during the robbery fell out of the car as he fled the scene.

McGiboney gave defendant a trash bag, bleach, and towels so he could bleach his blood-stained clothing and wipe himself down. She also gave him a change of clothes to wear. Defendant then offered to share $20,000 with McGiboney if she accompanied him to his car. McGiboney declined. She was beginning to question defendant's story about reclaiming his grandfather's property. Nevertheless, she agreed to tell police defendant stayed the night with her and his injuries were caused by riding a three-wheeler the previous day. Defendant left her apartment sometime around 10:00 a.m. He was arrested a short time later. Eventually, McGiboney learned about the attack on Johnson, called the police, and revealed the details of defendant's visit.

## DISCUSSION

Because each of the crimes committed in this case was incident to a single criminal objective, i.e., stealing $20,000 from the victim, section 654 required the trial court to stay execution of sentence on all but one of defendant's convictions.

Section 654, subdivision (a), provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the

5

provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

This section "prohibits punishment for two crimes arising from a single indivisible course of conduct.  [Citation.]  If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once.  [Citation.]  If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct.  [Citation.]  The defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence.  [Citation.]"  (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525; *Neal v. State* (1960) 55 Cal.2d 11, 19, disapproved on another point in *People v. Correa* (2012) 54 Cal.4th 331, 338; *People v. Latimer* (1993) 5 Cal.4th 1203, 1208, 1216-1217.)

In *People v. Miller* (1977) 18 Cal.3d 873 (*Miller*), overruled on another ground as stated in *People v. Oates* (2004) 32 Cal.4th 1048 at pages 1067-1068, footnote 8, the defendant was convicted of first degree robbery, first degree burglary, and assault with a deadly weapon.  (*Id*. at p. 877.)  He and an accomplice entered a jewelry store with the intent to steal jewelry.  While the accomplice was being helped by the sales clerk, the defendant approached the security guard, announced the purpose of their visit, and attempted to pull a gun.  A struggle for the gun ensued.  The defendant shot the security guard.  The accomplice also pulled a gun and ordered the clerk onto the floor.  The robbers then broke into two display cases and made off with a substantial amount of jewelry.  (*Id*. at pp. 878-879.)  Applying the foregoing intent and objective test, our Supreme Court explained:  "It appears clear . . . that in the instant case [the] defendant entertained but a single criminal objective—to commit a theft of the contents of the jewelry store—and that those acts which constituted the burglary, the robbery and the

6

assault were performed only as incidental objectives to that principal objective." (*Id*. at p. 885.) Nevertheless, the court held the defendant could be separately punished for the burglary and the robbery because each was a violent crime committed against a separate victim, i.e., the robbery was committed against the sales clerk and the burglary was committed against the security guard. (*Id*. at pp. 885-886.) Punishment for the assault, however, was precluded by section 654 because "[t]hat crime was committed during the same course of conduct and against the same victim as in the case of the aggravated burglary conviction." (*Id*. at p. 886.)

Here, it appears equally clear defendant entertained a single criminal objective—to commit a theft of the $20,000 he believed Johnson had hidden in her mobile home—and the acts that constituted the burglary, the robbery, the assaults, the false imprisonment, the criminal threat, and the vehicle theft were performed only as incidental to accomplishing that principal objective. And, unlike *Miller*, *supra*, 18 Cal.3d 873, in this case, there was only a single victim.

Nevertheless, the Attorney General argues: "The evidence suggested that [defendant], believing that the victim was in possession of $20,000, entered the victim's trailer hoping to steal the money while she slept. He was aware that she had consumed the whiskey and that she had a practice of using sleeping pills. He did not enter the trailer and confront the victim. Instead, he quietly rooted around in her closet, hoping to find the money without waking her. Only when the victim, not having taken a sleeping pill, awoke, did [defendant] form the intent to commit the other offenses." While the Attorney General cites no authority for this line of argument, it does find some support in *People v. Vidaurri* (1980) 103 Cal.App.3d 450 (*Vidaurri*), in which the defendant stole certain items from a Sears department store, repeatedly attacked two security guards with a knife when they confronted him outside the store, and also assaulted a man and his daughter with the knife in an attempt to steal the man's car to complete his escape with

7

the merchandise. (*Id.* at pp. 455-456.) Holding the defendant could be separately punished for both the burglary and the assaults that occurred as he attempted to escape apprehension, the Court of Appeal explained: "[The] defendant testified that he was brought to the Sears store in a car driven by his friend, Cedro. Cedro dropped him off at Sears and went to shop in another store. Defendant told his friend that he would meet him outside of Sears, and his friend agreed to pick him up there in 15 to 20 minutes. Defendant's testimony thus establishes that he intended to steal merchandise from Sears and to leave the area in a car driven by his friend. This evidence supports the trial court's determination that the burglary and subsequent assaults were *not* part of one continuous, indivisible course of conduct. On the contrary, the assaults were committed in response to the unforeseen circumstance—the approach of the Sears security guards." (*Id.* at pp. 465-466; see also *People v. McGahuey* (1981) 121 Cal.App.3d 524, 529 [multiple punishment permissible for burglary in which the defendant stole money and a hatchet from a house and assault with a deadly weapon in which the defendant, after leaving the house, threw the hatchet through a window at the victim who was calling the police].)

Here, unlike *Vidaurri, supra*, 103 Cal.App.3d 450, and *People v. McGahuey, supra*, 121 Cal.App.3d 524, defendant had not left the burglarized structure with stolen property at the time he committed the assaults. Instead, he was looking for the $20,000 *inside Johnson's mobile home* when she woke up and confronted him. He then assaulted her, tied her up, and threatened her life *to enable him to continue looking for the money* and *to scare her into telling him where the money was located*. Each of these offenses was committed pursuant to a single principal objective—stealing $20,000 from the mobile home. Moreover, unlike *Vidaurri*, the circumstance of Johnson waking up while defendant committed the burglary was not unforeseen. Strange as it may be, defendant prepared for this eventuality by entering the mobile home in the nude. As he explained, he did this to prevent someone from grabbing onto his clothing in the event of a struggle.

8

Finally, we also reject the Attorney General's argument that defendant may be separately punished for stealing Johnson's car. While the vehicle theft occurred after defendant left the mobile home, the fact remains the only reason defendant stole the car was to allow him to escape with the garbage can of items he believed could contain the $20,000. (See *People v. Bauer* (1969) 1 Cal.3d 368, 376-377 [multiple punishment not permissible for robbery in which the defendant and an accomplice robbed the victims of property in their home and vehicle theft in which the robbers stole a car belonging to one of the victims after loading the car with loot from the robbery].) Nor is *Bauer* distinguishable simply because that case involved robbery and vehicle theft, while this case involves burglary and vehicle theft. The point of *Bauer* was that a vehicle theft is not separately punishable from a home invasion robbery where the two offenses are part of an indivisible transaction. Stated differently, both the robbery and the vehicle theft were the means of accomplishing the single objective of stealing from the victims. This was so even if the robbery was technically complete before the robbers drove away in the vehicle: "The fact that one crime is technically complete before the other commenced does not permit multiple punishment where there is a course of conduct comprising an indivisible transaction." (*Id*. at p. 377.) So too here. The burglary of Johnson's mobile home was technically complete the moment defendant entered the residence with the intent to steal. However, this does not make the robbery separately punishable from the burglary. (See *People v. Le* (2006) 136 Cal.App.4th 925, 931.) By parity of reasoning, neither is the vehicle theft separately punishable.

In sum, each of the crimes committed in this case was incident to a single criminal objective─stealing $20,000 from the victim. Accordingly, section 654 required the trial court to stay execution of sentence on all but one of defendant's convictions. Because the trial court imposed and executed sentence on Count 2 and stayed execution of sentence on Count 1, we modify the judgment to do the same with respect to Counts 3 through 7.

9

## DISPOSITION

The judgment is modified to stay execution of sentence on Counts 3 through 7.  As modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment reflecting the stay of execution of sentence on Counts 3 through 7 and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


         HOCH       , J.


We concur:


       BUTZ      , Acting P. J.


       MAURO     , J.